ORI KATZ, Cal. Bar No. 209561
okatz@sheppardmullin.com
MICHAEL M. LAUTER, Cal. Bar No. 246048
mlauter@sheppardmullin.com
SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109
Telephone:     (415) 434.9100
Facsimile:     (415) 434.3947

Attorneys for the Official Committee of
Unsecured Creditors

MICHAEL W. MALTER,
Cal. Bar No. 96533
michael@bindermalter.com
JULIE H. ROME-BANKS,
Cal. Bar No. 142364
julie@bindermalter.com
BINDER & MALTER, LLP
2775 Park Avenue
Santa Clara, CA 95050
Telephone: (408) 295-1700
Facsimile: (408) 295-1531

Attorneys for the Debtors and Debtors-in-
Possession, SECOND STREET PROPERTIES
and BERKELEY PROPERTIES, LLC

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

|  |  |
|---|---|
| In re<br><br>SECOND STREET PROPERTIES,<br>a California corporation[1]<br>           Debtor. | Case No. 14-41045-RLE<br>Case No. 14-41048-RLE<br><br>Chapter 11<br><br>Cases Jointly Administered<br><br>**DISCLOSURE STATEMENT FOR DEBTORS' AND COMMITTEE'S SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION DATED APRIL 30, 2015** |
| In re<br><br>BERKELEY PROPERTIES, LLC, a<br>California limited liability company,<br><br>Debtor. |  |

---

[1]Second Street Properties was formerly known as Pacific Steel Casting Company.

# TABLE OF CONTENTS

Page(s)

ARTICLE I INTRODUCTION ..................................................................... 1
   A.   Purpose of the Disclosure Statement:........................................... 1
   B.   How to Vote: ................................................................................. 1
   C.   Enclosures: ................................................................................... 1
   D.   Definitions: ................................................................................... 2
   E.   Plan Summary: ............................................................................. 2
ARTICLE II GENERAL BACKGROUND INFORMATION REGARDING THE DEBTORS .... 4
ARTICLE III REASONS FOR FINANCIAL DIFFICULTIES ....................... 5
   A.   DHS Audit and Resulting Terminations in Workforce: ................ 5
   B.   Litigation Spawned by Terminations, Including Class Action Suit and Settlement Thereof: 6
   C.   Lawsuit with Nearby Residents: ................................................... 6
   D.   Reduced Borrowing Capacity: ...................................................... 7
   E.   Decision to Preserve Going Concern Value Through A Bankruptcy Sale Process: .............. 7
ARTICLE IV RELEVANT EVENTS DURING THE BANKRUPTCY CASES ........................... 8
   A.   Case Commencement: ................................................................... 8
   B.   Retention of Professional by the Debtors: .................................... 8
   C.   Formation of Creditors' Committee: ............................................. 8
   D.   First Day and Related Motions: .................................................... 8
   E.   Application to Appoint Responsible Individual: ........................... 9
   F.   Post-Petition Financing: ............................................................... 9
   G.   Approval of Bid Procedures: ...................................................... 10
   H.   Approval of the Sale and Related Motions: ................................ 10
   I.   Closing of the Sale and Repayment of Siena: ............................ 11
   J.   Rejection of Leases and Executory Contracts:............................ 11
   K.   Objection to Claim of IRS:.......................................................... 11
   L.   Final Approval of the Class Action Settlement:.......................... 12
   M.   Operations After the Sale of Assets:........................................... 12
   N.   Claims Bar Dates:........................................................................ 13
   O.   Cranetech Adversary Proceeding: ............................................... 13
   P.   Summary of Monthly Operating Reports: ................................... 14
   Q.   Claims Related to the Defined Benefit Pension Plan: ................. 14
   R.   Claims by the Buyer: ................................................................... 14
   S.   Contingent Claim of Local 164B: ............................................... 15
ARTICLE V PLAN OF REORGANIZATION ............................................ 16
   A.   Administrative Expense Claims .................................................. 16
      1.   Applicable Bar Dates for Administrative Expense Claims........................................ 17

2. Professional Fees. ................................................................ 17

3. Statutory U.S. Trustee Fees .............................................. 18

B. Priority Tax Claims: ............................................................... 18

C. CLASSIFICATION OF CLAIMS AND INTERESTS - SUMMARY OF CLASSIFICATIONS: ............................................................................ 18

D. Classes Under the Plan: .......................................................... 19

E. TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS: ................................. 19

Class 1 – Priority Non-Tax Claims. ............................................ 19

1. Impairment and Voting. ..................................................... 19

2. Treatment. .................................................................. 19

Class 2 – Miscellaneous Secured Claims. ...................................... 20

1. Impairment and Voting. ..................................................... 20

2. Alternative Treatment. ..................................................... 20

a. Abandonment or Surrender. ............................................. 20

b. Cash Payment. ........................................................ 20

c. Unimpairment. ........................................................ 20

3. Unsecured Deficiency Claim. ............................................... 20

Class 3 – Disputed CraneTech Claims. ......................................... 21

1. Impairment and Voting. ..................................................... 21

2. Initial Treatment of Claim. ............................................... 21

3. Treatment if Claim is Allowed by a Final Order. .......................... 21

Class 4 – Local 164B Claim. .................................................... 22

1. Impairment and Voting. ..................................................... 22

2. Treatment. .................................................................. 22

Class 5 – General Unsecured Claims Against Berkeley Properties. ............... 24

1. Impairment and Voting. ..................................................... 24

2. Treatment. .................................................................. 24

Class 6 – General Unsecured Claims Against Second Street Properties. .......... 24

1. Impairment and Voting. ..................................................... 24

2. Treatment. .................................................................. 24

Class 7 – Interests in Second Street Properties ............................... 25

1. Impairment and Voting. ..................................................... 25

2. Treatment. .................................................................. 25

Class 8 – Interests in Berkeley Properties .................................... 26

1. Impairment and Voting. ..................................................... 26

2. Treatment. .................................................................. 26

F. PRELIMINARY ESTIMATES OF ALLOWED CLAIMS .................................... 26

ARTICLE VI ALTERNATIVES TO THE PLAN .............................................. 28

A. General: .......................................................................... 28

B. Best-Interests–of-Creditors Test and Chapter 7 Liquidation Analysis: ........ 28

Case: 14-41045    Doc# 537    Filed: 04/30/15    Entered: 04/30/15 14:02:37    Page 3 of
41
SMRH:437127496.2                                    DISCLOSURE STATEMENT FOR SECOND AMENDED JOINT PLAN

ARTICLE VII FEASIBILITY ................................................................ 30

ARTICLE VIII CONFIRMATION ......................................................... 31

    A.    Voting: .............................................................................. 31

    B.    Confirmation Standards: ...................................................... 32

    C.    Modification: ...................................................................... 33

ARTICLE IX FEDERAL INCOME TAX CONSEQUENCES OF PLAN FOR CREDITORS .... 33

ARTICLE X CONCLUSION ................................................................ 34

    A.    Effect of Confirmation: ....................................................... 34

    B.    Recommendation: ............................................................... 34

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SMRH:437127496.2

iiii

DISCLOSURE STATEMENT FOR SECOND AMENDED JOINT PLAN

# ARTICLE I

## INTRODUCTION

**A.      Purpose of the Disclosure Statement:**

Debtors and debtors in possession Second Street Properties (formerly known as Pacific Steel Casting Company) ("Second Street Properties") and Berkeley Properties LLC ("Berkeley Properties") (jointly, the "Debtors"), together with the Official Committee of Unsecured Creditors (the "Committee," and collectively with the Debtors, the "Proponents") prepared this Joint Disclosure Statement ("Disclosure Statement").  It is distributed to creditors to solicit acceptances of the Debtors' and Committee's Joint Chapter 11 Plan of Reorganization (the "Plan").  The Plan is served with the Disclosure Statement.  This Disclosure Statement's purpose is to provide all persons who hold claims against or interests in the Debtors ("Claimants") with information adequate to enable them to make informed judgments about the Plan in voting to accept or reject it.

**B.      How to Vote:**

The Debtors and the Committee will file a motion to establish the procedures for voting on the Plan which they will request the Court set at the same date and time as the hearing on the approval of this Disclosure Statement.  Detailed voting procedures will be set forth in that motion, and will be posted for free at under the Key Documents section at the following website: http://dm.epiq11.com/PSC.

**C.      Enclosures:**

Enclosed with this Disclosure Statement is a copy of the Plan, a ballot (if your claim or equity interest is to be impaired under the Plan), the order approving this Disclosure Statement, a notice advising creditors of information regarding the Plan confirmation hearing along with a letter from the Committee recommending that creditors vote to support confirmation of the Plan. Alternatively, if you are not entitled to vote on the Plan, you will receive a notice of non-voting status.

**D.  Definitions:**

This Disclosure Statement uses terms which are defined in the Plan.  A term used in this Disclosure Statement or the Plan that is defined in the Bankruptcy Code has the meaning given to that term in the Bankruptcy Code.  The rules of construction contained in the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure apply in this Disclosure Statement.  To the extent that terms defined in the Plan or Disclosure Statement are inconsistent with definitions or meanings provided by the Bankruptcy Code or Rules, the Bankruptcy Code or Rules shall control.

**E.  Plan Summary:**

The Plan is a reorganization plan.  It provides for the replacement of the Debtors' current management with new management led or selected by a Plan Administrator, for the continuation of the Debtors' business of owning and leasing certain real property located in Berkeley, California to the buyer of its former steel casting business, and for treatment of the outstanding Allowed Claims against and Interests in the Debtors. The Plan does not provide for any substantive consolidation of the Debtors' estates.

Under the Plan, distributions are intended to be made to Holders of Allowed Administrative Expense Claims (Unclassified), Allowed Priority Tax Claims (Unclassified), Allowed Priority Non-Tax Claims (Class 1), Allowed Miscellaneous Secured Claims (Class 2), and Allowed General Unsecured Claims against Berkeley Properties (Class 5) and Allowed General Unsecured Claims against Second Street Properties (Class 6).  The Holder of the Disputed CraneTech Claims (Class 3) will receive one of the alternative forms of treatment set forth herein as a Secured Claim if and only if it obtains a Final Order in the CraneTech Adversary Proceeding providing that some or all of the Disputed CraneTech Claims are Allowed Secured Claims. Otherwise, the Disputed CraneTech Claims will be treated as a General Unsecured Claims Against Second Street Properties to the extent that they are Allowed.  The Holder of the Local 164B Claim (Class 4) will not receive a distribution of Cash in the Plan, but will receive a deed of trust encumbering the real property owned by the Berkeley Properties pursuant to an agreement with the Proponents.  Holders of Interests in Second Street Properties (Class 7) will receive new Interests in Reorganized Second Street Properties and shall be deemed to grant to the Post-

Confirmation Committee an irrevocable proxy to exercise all voting and approval rights represented by those Interests until such time as the Holders of Allowed Claims of Classes 5 and 6 have been paid in full with interest at the Legal Rate. Holders of Interests in Berkeley Properties (Class 8) shall retain their Interests. Second Street Properties is the sole interest holder of Berkeley Properties. After the proceeds produced by the assets of Berkeley Properties are used to pay the Holders of Allowed Class 5 Claims Against Berkeley Properties, said proceeds will be used to make distributions to the Holders of Allowed Class 6 Claims against Second Street Properties. Finally any remaining proceeds shall be distributed to the Class 7 Interest Holders.

Until the Holders of Class 5 and Class 6 Claims are repaid in full with interest at the Legal Rate, the Debtors' businesses and their obligations under this Plan will be run primarily by a Plan Administrator to be identified in the notice of hearing on confirmation of the proposed Plan. If the Plan Administrator is an individual, the Plan Administrator will be the sole officer and one of the three directors of Second Street Properties, and shall select the other two directors, whose identities will also be revealed in the notice of hearing on confirmation of the proposed Plan. If the Plan Administrator is a corporate entity, the Plan Administrator will select one of its members, officers, employees or agents to be the sole officer and one of three directors of Second Street Properties, and shall select the other two directors, all of whose identities will be revealed in the notice of hearing on confirmation of the proposed Plan. The Plan Administrator will be subject to the oversight of the Post-Confirmation Committee as provided herein. Also, until the Holders of Class 5 and Class 6 Claims are repaid in full with interest at the Legal Rate, the Interests in Reorganized Second Street Properties granted to Holders of Interests in Class 7 will be subject to an irrevocable proxy that gives all voting and approval rights to the Post-Confirmation Committee. Once the Holders of Class 5 and Class 6 Claims are repaid in full with interest at the Legal Rate, the proxy shall terminate.

Certain documents implementing the terms of the Plan described above, including the deed of trust given to the Holder of the Local 164B Claim, the irrevocable proxy held by the Post-Confirmation Committee, and the amended and restated organizational documents for Reorganized Second Street Properties and Reorganized Berkeley Properties will be filed with the

Court by May 29, 2015 in a Plan Supplement. These documents may be obtained by contacting counsel for the Proponents at the addresses listed on the first page of this Disclosure Statement, or by visiting the Key Documents section at the following website: http://dm.epiq11.com/PSC

## ARTICLE II

## GENERAL BACKGROUND INFORMATION REGARDING THE DEBTORS

Second Street Properties, founded in 1934, was a privately-owned steel foundry based in Berkeley, California. Second Street Properties manufactured carbon, low-alloy and stainless steel castings ranging from one ounce to 7,000 pounds. Second Street Properties manufactured castings based on customer's specifications and shipped products on a just-in-time basis. Second Street Properties operated three separate plants on nine acres of land: a green sand plant, a shell mold plant and an air set plant. Second Street Properties' plants incorporated some of the latest manufacturing technology, production capabilities and emissions controls. This allowed Second Street Properties to remain competitive with domestic and international suppliers, and maintain compliance with environmental regulations.

The green sand plant, opened in 1934, was the company's original production facility. This plant produced castings ranging from one pound to 1,500 pounds. The shell mold plant, which opened in 1975, specialized in smaller, more complex castings, ranging from one ounce to 60 pounds. The air set plant opened in 1981 and is considered the world's most efficient, high volume producer of castings up to 7,000 pounds.

Second Street Properties earned an impressive reputation for quality. It specialized in the production of large, complex castings as well as providing design and engineering assistance on the front end and heat treating, machining and other processes on the back end. Primary end markets include oil drilling equipment and heavy-duty trucks.

Since its inception as a six-man partnership in 1934, Second Street Properties grew into a significant force in the steel casting industry. Second Street Properties was incorporated as a California C-corporation in March 1946 and at the time of bankruptcy employed over 500 hourly and 50 salaried employees at its production and administrative facilities. The majority of the hourly employees are represented by the CTMA - Glass, Molders, Potter, Plastics and Allied

4
DISCLOSURE STATEMENT FOR SECOND AMENDED JOINT PLAN

1 Workers International Union (Local 164B) ("Local 164B"). Second Street Properties was

2 operated by the family/owners since inception, along with a talented group of professionals. This

3 combined management team has been able to blend the latest technological developments in the

4 industry with a plant modernization and expansion program to produce a rapidly growing

5 company. During its history of over 80 years, Second Street Properties became one of the leading

6 steel casting companies in the United States.

7      In 2007, Second Street Properties created Berkeley Properties LLC, a wholly owned

8 subsidiary of Second Street Properties. The title to the 10 separate parcels of real property (where

9 Second Street Properties operated in Berkeley, California) was transferred into this LLC.

10 Berkeley Properties continues to be 100% owned by Second Street Properties.

11 **ARTICLE III**

12 **REASONS FOR FINANCIAL DIFFICULTIES**

13      In 2008, when the Great Recession hit, Second Street Properties' business slowed. At the

14 same time as its operations were suffering due to this general slowing, the company encountered a

15 wave of significant obstacles that combined to constrain its ability to operate and necessitated the

16 filing of the voluntary chapter 11 petitions for Second Street Properties and Berkeley Properties.

17 **A.**     **DHS Audit and Resulting Terminations in Workforce:**

18      In early 2011, agents of the Immigration and Customs Enforcement, U.S. Department of

19 Homeland Security (DHS) began an audit of Second Street Properties' Employment Eligibility

20 Verification Forms (commonly known as I-9 Forms). The DHS audit resulted in Second Street

21 Properties terminating nearly 200 of its front-line manufacturing employees. Second Street

22 Properties worked diligently to replace the employees lost as a result of the DHS audit and to train

23 the new workers, but the loss of such a significant numbers of experienced workers severely

24 affected productivity. In addition, the DHS provided notice in May 2013 that it intended to assess

25 Second Street Properties with a civil penalty of $401,255.25 in connection with the audit. Second

26 Street Properties was not in a financial position to pay the civil penalty and sought to negotiate a

27 settlement agreement with the DHS.

28

Case: 14-41045   Doc# 537   Filed: 04/30/15   Entered: 04/30/15 14:02:37   Page 9 of
41

DISCLOSURE STATEMENT FOR SECOND AMENDED JOINT PLAN

**B.**    **Litigation Spawned by Terminations, Including Class Action Suit and Settlement Thereof:**

In addition to reduced productivity, the terminations spawned litigation that further impacted Second Street Properties' ability to operate outside of bankruptcy. Upon termination, many of the terminated employees immediately filed workers' compensation claims against the company, which resulted in a four-fold increase in the company's workers compensation insurance premiums. The terminations done as a consequence of the DHS audit also precipitated the filing of a wage-and-hour class action lawsuit against Second Street Properties entitled Roberto Rodriguez et al. v. Pacific Steel Casting Co., filed in Alameda County Superior Court as case number RG11609595 on December 23, 2011 (the "Class Action"). Second Street Properties vigorously defended the Class Action. A class of approximately 1,300 current and former employees of Second Street Properties was certified (the "Class Action Claimants"). The Class Action was scheduled for trial to commence in February, 2014. Following two years of litigation, the parties participated in an all-day mediation session on January 24, 2014. As a result of that mediation, the parties to the Class Action entered into a settlement agreement ("Class Action Settlement) which generally provided for a settlement of $5.4 million in full and complete settlement of the Class Action along with other pertinent terms. The Class Action Settlement also provided that the settlement claims administrator for the Class Action Claimants would be Gilardi & Co., LLC ("Class Action Claims Administrator"). The Class Action Settlement received preliminary approval from the Superior Court by order entered on February 28, 2014. Because of its financial difficulties Second Street Properties was not in a position to fund the Class Action Settlement, a fact which was fully disclosed during the mediation session. Rather, Second Street Properties disclosed during the mediation its intention to shortly file for chapter 11 protection and the Class Action Settlement therefore provide that in the event the bankruptcy case were to convert to chapter 7, the amount of the Class Action Settlement would increase to $25 million.

**C.**    **Lawsuit with Nearby Residents:**

In addition to the lawsuits arising from the terminations done after the DHS audit, Second Street Properties faced lawsuits from its neighbors in Berkeley, CA as well. In April 2012, Second

1  Street Properties settled a lawsuit brought on behalf of nearby residents alleging, among other

2  things, negligence, battery and trespass.  The settlement required a one-time payment of $190,000

3  which was made in June of 2012.  The settlement also requires that Second Street Properties

4  identify one or more capital improvement projects that are intended to further identify, control,

5  reduce, or minimize emissions and/or odors (with a value of $585,000 including maintenance for

6  up to 10 years).  Second Street Properties spent considerable time and money on legal support

7  during the years that let up to this settlement. However, because of the other financial challenges it

8  was facing, Second Street Properties has not yet funded the capital improvement projects.

9  **D.      Reduced Borrowing Capacity:**

10         Further, Second Street Properties' business was also endangered by new constraints

11  imposed by its pre-petition lender that severely limited Second Street Properties' ability to borrow

12  the funds necessary to finance its operations.  Prior to the bankruptcy filing, Second Street

13  Properties and Berkeley Properties had only one large secured creditor, Wells Fargo Bank, N.A.

14  ("Wells Fargo").  Historically, Wells Fargo provided Second Street Properties with a line of credit

15  to finance its day-to-day operations.  Wells Fargo also provided a term loan secured on the

16  Berkeley real estate owned by Berkeley Properties which loan was guaranteed by Second Street

17  Properties and Second Street Properties' majority shareholder.  In the latter part of 2013, due to

18  failure to meet certain performance covenants, Wells Fargo informed Second Street Properties that

19  it would need to find an alternative source of financing.  By agreement, Wells Fargo reduced the

20  funds available to Second Street Properties under the line of credit in the second half of 2013 and

21  eventually froze the line of credit in February, 2014.

22  **E.      Decision to Preserve Going Concern Value Through A Bankruptcy Sale Process:**

23         With all of the above challenges, Second Street Properties and Berkeley Properties realized

24  that in order to preserve Second Street Properties' steel casting business for the benefit of its

25  creditors, employees, and estate, they would need to file for chapter 11 bankruptcy protection and

26  seek to sell at least Second Street Properties' assets as a going concern.  Second Street Properties

27  and Berkeley Properties began working with investment bankers at Cleary Gull to market their

28  assets for such a sale in February 2014 at the same time as they began to prepare for their chapter

11 bankruptcy filings with their chosen bankruptcy counsel. An electronic data room was established and the Debtors commenced marketing their assets for a going concern sale in February 2014. The Debtors then filed their voluntary chapter 11 bankruptcy petitions on March 10, 2014, commencing these Bankruptcy Cases.

## ARTICLE IV

## RELEVANT EVENTS DURING THE BANKRUPTCY CASES

**A.    Case Commencement:**

The Debtors separately filed their voluntary petitions under chapter 11 of title 11 of the United States Code on March 10, 2014 (the "Petition Date") and they continue to operate as debtors-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

**B.    Retention of Professional by the Debtors:**

On April 1, 2014, the Court entered its order appointing Binder & Malter LLP as bankruptcy counsel to the Debtors in these cases. The Court subsequently also authorized the appointment of the following professionals to the Debtors: (i) Burr Pilger Mayer as financial advisors; (ii) Cleary Gull Inc. as investment bankers; (iii) Mowat Mackie & Anderson LLP as accountants; (iv) Chang, Ruthenberg & Long P.C. as ERISA counsel; (v) Thoits, Love, Hershberger & McLean as transactional counsel; and, (vi) Littler Mendelson P.C. as labor counsel.

**C.    Formation of Creditors' Committee:**

The Office of the United States Trustee formed the Official Unsecured Creditors' Committee (the "Committee") on March 21, 2014. The Committee retained Sheppard, Mullin, Richter & Hampton LLP as counsel and Arch & Beam Global LLC as financial advisors.

**D.    First Day and Related Motions:**

Immediately following the filing of the voluntary petitions, the Debtors sought relief from the Court including: (i) a motion to approve a stipulation with secured creditor Wells Fargo Bank authorizing the Debtors to continue to use cash collateral for normal operations pursuant to an operating budget pending a final hearing; (ii) a motion authorizing the Debtors to continue to use their pre-petition cash management practices and existing bank accounts; (iii) a motion authorizing the Debtors to pay pre-petition employee compensation, benefits and Union obligations; (iv) a

1  motion for joint administration; and, (v) a motion to limit notice. The Court approved the
2  preliminary use of cash collateral and later also approved the final use of cash collateral following
3  a fully noticed hearing. The Court approved the Debtors' request to continue to utilize its existing
4  cash management systems and to pay pre-petition employee compensation up to the priority limit,
5  employee benefits and Union obligations in the ordinary course of business. The cases were
6  ordered jointly administered. After a further hearing, the Court granted the request to limit notice,
7  along with the appointment of Epiq Bankruptcy Solutions LLC ("Epiq") as the official claims,
8  balloting and noticing agent in these cases and approved the form of a substitute notice of
9  commencement of cases, of the first meeting of creditors and the initial claims bar date.

10  **E.      Application to Appoint Responsible Individual:**

11          On March 13, 2014, the Court entered orders in both cases appointing Charles H. Bridges
12  III, Chief Financial Officer of Second Street Properties, as the responsible individual for both
13  Debtors. Subsequently, following closing of the sale of assets described below, the Debtors
14  obtained an Order on September 5, 2014 appointed Catherine Delsol, President and CEO of
15  Second Street Properties and the Managing Member of Berkeley Properties as the successor
16  responsible individual in these cases.

17  **F.      Post-Petition Financing:**

18          Shortly after the Petition Date, the Debtors entered into a proposed debtor in possession
19  credit agreement to provide the Debtors with post-petition financing for ongoing operations.
20  Although the Debtors had received authorization to use the cash collateral of Wells Fargo Bank,
21  Wells Fargo Bank was unwilling to further extend any credit to the Debtors post-petition. The
22  Debtors knew based on anticipated cash flow projections including the annual renewal of their
23  workers compensation insurance policy, that they could not continue normal operations in chapter
24  11 without access to a credit facility. The Debtors therefore sought approval of a new revolving
25  line of credit from Siena Lending Group ("Siena") of up to $8.5 million for purposes of allowing
26  the Debtors to repay the existing secured indebtedness owed to Wells Fargo Bank, as well as
27  providing the Debtors with operating capital. After negotiating resolution to objections raised by
28  the Committee, the Court granted approval of the post-petition financing motion which provided

SMRH:437127496.2

1  Siena with a senior security interest in the Debtors' assets and a superpriority administrative

2  expense claim, as well as modification to the automatic stay and related relief.

3  **G.    Approval of Bid Procedures:**

4          Following extensive pre-petition and post-petition marketing of assets by their appointed

5  investment bankers Cleary Gull Inc., the Debtors negotiated the terms of a comprehensive Asset

6  Purchase Agreement (the "APA") with a stalking horse bidder, Speyside Fund LLC or its assignee

7  ("Speyside"), subject to overbid.  The APA generally provided for the sale of Second Street

8  Properties' foundry business on a going concern basis and included the assumption and

9  assignment of specific executory contracts and leases, as well as entering into a new long term

10 lease between Speyside and Berkeley Properties for the use of the real property where the foundry

11 operates.  On June 19, 2014, the Debtors filed their MOTION TO APPROVE OVERBID

12 PROCEDURES RE SALE OF DEBTORS' ASSETS AND RELATED RELIEF ("Bid Procedures

13 Motion") which set forth the proposed schedule and process for approval of the sale of assets of

14 the Debtors' assets and auction.  The relief requested in the Bid Procedures Motion was granted by

15 order entered on June 30, 2014.

16 **H.    Approval of the Sale and Related Motions:**

17         On June 30, 2014, the Debtors filed their MOTION TO APPROVE SALE OF

18 SUBSTANTIALLY ALL ASSETS FREE AND CLEAR OF LIENS AND RELATED RELIEF,

19 together with related motions to (i) approve the assumption and assignment of leases and

20 executory contracts; and, (ii) to conditionally approve a new real property lease between Berkeley

21 Properties and Speyside and rejection of the existing real property lease between Second Street

22 Properties and Berkeley Properties (collectively the "Sale Motions").  Notice of the Sale Motions

23 and the auction hearing scheduled for July 28, 2014 was provided to creditors and potentially

24 interested bidders pursuant to the Court's order approving the Bid Procedures Motion.  No other

25 potential overbidding parties came forward prior to or at the time of the hearing.  Based upon a

26 resolution reached between the Debtors and Speyside, certain objections raised by the Committee

27 and one of the affected landlords were resolved and the Sale Motions were approved.  The Court's

28 orders approving the sale and related motions were thereafter entered on July 31, 2014.

SMRH:437127496.2                              DISCLOSURE STATEMENT FOR SECOND AMENDED JOINT PLAN

**I.    Closing of the Sale and Repayment of Siena:**

Following the hearing on July 28, 2014, the Debtors were ordered to give notice of the pending sale to Sentry Insurance ("Sentry") and certain other parties.  The Debtors and Speyside also used the intervening time to negotiate an amendment to the APA to clarify certain terms and conditions of the sale, including certain adjustments to the purchase price.  The Court approved an ex parte application to amend the APA, however Sentry objected to the amendment.  Ultimately, the parties were able to achieve a satisfactory resolution and the Court entered a further order that resolved Sentry's concerns.  The sale of substantially all assets closed on August 29, 2014 just prior to midnight to Pacific Steel Casting Company, a Delaware limited liability company ("Buyer" or "New Pacific Steel"), an assignee of Speyside.  Funding of the sale transaction occurred the following business day and resulted in the repayment in full of the Siena DIP loan facility.  Executory contracts and leases were assumed and assigned to the Buyer, including the collective bargaining agreement with the Union.  The Buyer assumed responsibility for both of Second Street Properties' pension plans.  Cure payments were made to the holders of those executory contracts and leases that were assumed and assigned to the Buyer.  The Buyer re-hired all but approximately 20 former employees of Second Street Properties.

**J.    Rejection of Leases and Executory Contracts:**

Following consummation of the sale of assets to the Buyer, the Debtors identified those remaining leases and executory contracts that Buyer had not agreed to be responsible for and for which Second Street Properties no longer had need for the personal property items being leased or the other services which were being provided to Second Street Properties as part of the operation of its steel foundry business that was sold to the Buyer.  The Debtors brought a motion to reject those unnecessary leases and executory contracts which was granted by the Court, with a rejection claims bar date of November 14, 2014 also established.

**K.    Objection to Claim of IRS:**

The United States Internal Revenue Service (the "IRS") filed claim #47 asserting a claim of $32,358,877 for corporate income taxes for the tax year ending March 31, 2012 (the "2011 Tax Year") and alleging that the entire claim is entitled to priority treatment under Bankruptcy Code §

507(a)(8). Second Street Properties has filed an objection to claim #47 together with a motion to establish the amount of tax liability pursuant to 11 U.S.C. §505(a)(1). The objection states that the IRS Claim is based upon taxes that have not been assessed and Second Street Properties has no information or reason to believe that it is obligated to the IRS to pay any income taxes for the 2011 Tax Year. Second Street Properties is informed and believes, and thereon alleges, that the IRS Claim is not based on any obligation, but is the result of a random informational audit currently being conducted by the IRS of Debtor's business for the tax year in question as part of the "National Research Program" of the IRS. In fact, during the year in question, the Debtor filed a timely tax return with the IRS, reflecting a significant loss. Bankruptcy Code §505(a)(1) provides that the court may determine the amount or legality of any tax, whether or not it has been previously assessed, whether or not paid, and whether or not previously contested. The IRS has admitted that its claim is unliquidated. The objection to the claim of the IRS remains pending at this time and the determination of the IRS proof of claim will affect the amount available for distribution to general unsecured non-priority creditors. The Plan Proponents believe that the IRS claim should be estimated for purposes of plan confirmation at zero. Notwithstanding, the Debtors may still be required to complete the audit. The IRS has estimated that it would take until approximately July 31, 2015 to complete the audit.

**L.     Final Approval of the Class Action Settlement:**

Following Court approval of a stipulation for relief from stay, the Superior Court granted final approved to the Class Action Settlement on October 16, 2014.

**M.     Operations After the Sale of Assets:**

Following the closing of the sale of assets, the Debtors and the Committee have resolved issues related to the value of inventory and receivables with the Buyer, as well as overpayment of the Siena DIP loan. The Buyer as the tenant of Berkeley Properties is obligated to make monthly rental payment according to a written lease which is for an initial term of 15 years. As part of the First Amendment to the APA and Lease, monthly base rent is currently abated for a period of 11.1 months; however the Buyer must still pay triple net charges such as real property taxes.

SMRH:437127496.2                                          DISCLOSURE STATEMENT FOR SECOND AMENDED JOINT PLAN

After the sale of the foundry business, and until the appointment of the Plan Administrator pursuant to the Plan, Catherine Delsol has been the primary officer in charge the Debtors. Ms. Delsol joined Second Street Properties in 2003 and was the fourth generation of her family to lead Second Street Properties. Prior to Second Street Properties, she held positions in technical sales, financial management and real estate. Catherine has a Bachelor of Arts Degree in Communications from California State University, Chico. Catherine is now the sole person left supporting Second Street Properties and Berkeley Properties and is the appointed Responsible Individual and the managing member of Berkeley Properties. She has been involved in transition of all items following the close of the sale of Second Street Properties' assets, including assisting with banking needs, communications, budget and expense containment, claims analysis and other "wind-down" requirements. Ms. Delsol is being compensated $150 hour for her services.

**N.      Claims Bar Dates:**

The Court established July 14, 2014 as the bar date for non-governmental units to file claims in these bankruptcy cases with Epiq. Certain other claims bar dates have been established for limited groups of creditors, such as those whose creditors whose contracts have been rejected and administrative claims arising prior to the closing of the sale of assets.

**O.      Cranetech Adversary Proceeding:**

In the context of its steel casting foundry operations, Second Street Properties used heavy machinery including moving equipment. Second Street Properties engaged the services of CraneTech Inc. ("CraneTech") to service certain equipment. In February and March 2014, CraneTech recorded Mechanics' Liens against the real property owned by Berkeley Properties in the collective amount of $322,551.81 contending that the outstanding amounts constitute a lien for labor, services, equipment and/or materials that was furnished for the construction of a building, improvement or structures on the real property. Berkeley Properties disputes this contention maintains that the unpaid invoices are for the maintenance and repair of equipment and do not constitute a proper basis for a mechanics' lien against the real property. The Debtors filed a Complaint for Declaratory Relief, to Expunge Mechanics' Liens and Avoid Statutory Liens (Adversary Proceeding No. 14-41048) which matter remains pending at this time. Since the

SMRH:437127496.2                    DISCLOSURE STATEMENT FOR SECOND AMENDED JOINT PLAN

1  validity of the CraneTech mechanics' liens have not yet been settled or determined at this time,

2  CraneTech's claims in these cases have been separately classified with the treatment of

3  CraneTech's claims dependent upon the outcome of the pending adversary proceeding.

4  **P.   Summary of Monthly Operating Reports:**

5  Attached hereto as Exhibit "A" are summaries of the most recent Monthly Operating

6  Reports filed by the Debtors.

7  **Q.   Claims Related to the Defined Benefit Pension Plan:**

8  During the course of due diligence in connection with the sale of assets, the Debtors

9  discovered that errors were made in 2011 by the administrator of Second Street Properties' non-

10 union pension plan, NH Hicks, Inc. and/or plan actuary Haness & Associates LLC.  In July 2014,

11 the Debtors filed with the IRS a Voluntary Correction Program Application (the "VCP") to correct

12 those errors as required by the asset purchase agreement.  The IRS has recently responded by

13 requesting additional documents regarding the VCP and the Debtors are complying with that

14 request.  Under the terms of the asset sale agreement, Debtors are responsible for any excess

15 amount of retirement benefits (and any applicable interest) definitely determined by the IRS

16 beyond that previously determined for any retiree whose termination date occurred after April 1,

17 2011 and prior to the Closing Date.  Pursuant to the terms of the asset sale agreement, $20,000

18 remains on deposit in an attorney-client trust account as a reserve to be used to pay any such

19 amounts until such benefit entitlement (or lack thereof) is definitively determined by the IRS.  In

20 the event the IRS were to disqualify the non-union pension plan due to the errors, the Buyer is

21 responsible for the consequences of such an occurrence.  The Debtors also reserve all rights and

22 claims against plan administrator NH Hicks, Inc. and/or plan actuary Haness & Associates LLC

23 for their actions which caused errors and caused the Debtors to incur damages, including filing

24 fees and legal expenses, as well as future damages in an as yet unknown amount.

25 **R.   Claims by the Buyer:**

26 Under the terms of the asset purchase agreement as amended, the Buyer received a period

27 of 90 days following the closing of the transaction during which time the Buyer could assert

28 claims for alleged breaches of the representations and warranties made by Second Street

Properties in the asset purchase agreement. The sale transaction closed on August 29, 2014.  On November 28, 2014 (the day after Thanksgiving), in an email communication the Buyer asserted a claim for returns of $256,000 and for uncollectable accounts receivable  of $250,000.  To date, the Buyer has provided no supporting details or documents to evidence such claims.  The asset purchase agreement provides that such disputes shall be submitted to and resolved by the Bankruptcy Court (either by agreement or by order of the Court) and that the sole and exclusive remedy for any amounts ultimately payable by Second Street Properties as the Seller to the Buyer shall be paid through a reduction in the amount of rent otherwise payable by the Buyer to Berkeley Properties LLC under the real property Lease until the amount of such rent abatement equals the amount determined to be due to the Buyer.

**S.      Contingent Claim of Local 164B:**

The CMTA – Glass, Molders, Pottery, Plastics & Allied Workers (Local 164B) Pension Trust (the "Local 164B") has filed a claim in the amount of $26,702,858 against Second Street Properties based on contingent withdrawal liability under the multi-employer union pension plan which Second Street Properties participates in pursuant to the collective bargaining agreement between Second Street Properties and Local 164B.  Although the Buyer has expressly assumed responsibility for Second Street Properties' obligations to Local 164B as part of the sale, by statute Second Street Properties remains secondarily liable to Local 164B on a contingent basis for a period of five (5) plan years following the closing of the sale through July 1, 2020 in the event that either (a) New Pacific Steel has not completely or partially withdrawn from Local 164B before July 1, 2020 or (b) New Pacific Steel has completely or partially withdrawn from Local 164B before July 1, 2020, and has completely satisfied all resulting withdrawal liability obligations to Local 164B when and as due, then, no later than 60 days following the occurrence of either (a) or (b) above .  In lieu of posting a cash bond at the time of closing of the sale transaction, or withholding all distributions from unsecured creditors until the expiration of the 5 year period of contingent liability, the Plan Proponents and Local 164B have agreed to provide Local 164B with security for its contingent claim in the form of the Berkeley Deed of Trust.  The Berkeley Deed of Trust is enforceable under its specific terms and conditions described in detail in the treatment of

the Class 4 Claim of Local 164B. Once the five year time period elapses and assuming there has been no ERISA triggering event, then Local 164B will be required to reconvey the Berkeley Deed of Trust and release its lien on the Berkeley real property.

**ARTICLE V**

**PLAN OF REORGANIZATION**

The Plan does not provide for any substantive consolidation of the Debtors' Estates. Claims against Second Street Properties shall be satisfied by the assets of Second Street Properties, and Claims against Berkeley Properties shall be satisfied by the assets of Berkeley Properties. Note however that because Berkeley Properties is a wholly owned subsidiary of Second Street Properties, once the Claims against Berkeley Properties are satisfied, the proceeds produced by the assets of Berkeley Properties (including, without limitation, the rental payments made to Berkeley Properties for use of the Berkeley Real Estate) shall be distributed to Second Street Properties, as Holder of 100% of the Interests in Berkeley Properties, and sole member of Class 8. Once such proceeds are distributed to Second Street Properties, they shall become assets of the Second Street Properties Estate and shall be used to satisfy Claims against and Interests in Second Street Properties in the manner set forth in this Plan.

**A.      Administrative Expense Claims**

As provided under Bankruptcy Code section 1123(a)(1), Administrative Expense Claims are not classified for purposes of voting on, or receiving distributions under, the Plan. Accordingly, holders of Administrative Expense Claims are not entitled to vote on this Plan.

To the extent that Allowed Administrative Expense Claims have not already been paid, satisfied or otherwise released prior to the Effective Date, and except to the extent that a Holder of an Allowed Administrative Expense Claim agrees to a different treatment, each Holder of an Allowed Administrative Expense Claim shall receive Cash from either the Estate of Second Street Properties or the Estate of Berkeley Properties in an amount equal to such Allowed Claim, in full and final satisfaction, settlement and release and in exchange for such Claim, on the later of the Effective Date or the date such Administrative Expense Claim becomes an Allowed

Case: 14-41045    Doc# 537    Filed: 04/30/15    Entered: 04/30/15 14:02:37    Page 20 of 41
SMRH:437127496.2                                                    DISCLOSURE STATEMENT FOR SECOND AMENDED JOINT PLAN

Administrative Expense Claim pursuant to a Final Order of the Bankruptcy Court, or as soon thereafter as reasonably practicable.

**1. Applicable Bar Dates for Administrative Expense Claims.**

Except for applications for payment by Professionals under the Bankruptcy Code and fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930, all requests for payment of outstanding Administrative Expense Claims incurred from the Petition Date through August 29, 2014 were required to be filed and served by no later than October 31, 2014, as set forth in the Order of the Bankruptcy Court entered on September 16, 2014 as Docket No. 329.

Except for applications for payment by Professionals under the Bankruptcy Code and fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930, and except for taxes that arise after the Petition Date (which shall be paid as and when they come due), all requests for payment of outstanding Administrative Expense Claims incurred from August 30, 2014 through the Effective Date shall be filed and served on the Plan Administrator no later than thirty (30) calendar days after the Effective Date.

**2. Professional Fees.**

All Professionals seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement for expenses incurred through and including the Effective Date in accordance with section 503(b) of the Bankruptcy Code, to the extent not already paid as a result of interim applications for such payment, shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date by no later than that date that is thirty (30) calendar days after the Effective Date or such other date as may be fixed by the Bankruptcy Court. Such Professional fee and expense Claims shall be paid in full in such amounts as are Allowed by the Bankruptcy Court (i) on the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is reasonably practicable, or (ii) upon such other terms as may be mutually agreed upon by such Holder of an Administrative Expense Claim and the Plan Administrator.

Case: 14-41045    Doc# 537    Filed: 04/30/15    Entered: 04/30/15 14:02:37    Page 21 of 41

3. **Statutory U.S. Trustee Fees.**

All United States Trustee fees payable by each Estate pursuant to 28 U.S.C. § 1930 shall be paid in full by each Estate in accordance with the Plan without the need for the Office of the United States Trustee to file any request for payment.

**B.** **Priority Tax Claims:**

As provided under Bankruptcy Code section 1123(a)(1), Priority Tax Claims are not classified for purposes of voting on, or receiving distributions under, the Plan. Accordingly, holders of Priority Tax Claims are not entitled to vote on this Plan.

To the extent that Allowed Priority Claims have not already been paid, satisfied or otherwise released prior to the Effective Date, and except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a different treatment, on the later of the Effective Date or the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is reasonably practicable, the Trustee shall pay to each Holder of an Allowed Priority Tax Claim, in full and final satisfaction, settlement and release and in exchange for such Claim, an amount in Cash equal to the unpaid amount of such Allowed Priority Tax Claim plus any interest that may be owing under Bankruptcy Code section 511, from either the assets of the Estate of Second Street Properties or the assets of the Estate of Berkeley Properties.

**C.** **CLASSIFICATION OF CLAIMS AND INTERESTS - SUMMARY OF CLASSIFICATIONS:**

The Plan is intended to address all Claims and Interests against the Debtors and any property or assets of the Debtors or their Estates, of whatever character. Claims and Interests, other than Administrative Expense Claims and Priority Tax Claims, are classified for all purposes including voting (unless otherwise specified), confirmation and distribution pursuant to the Plan as set forth below.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the

Case: 14-41045    Doc# 537    Filed: 04/30/15    Entered: 04/30/15 14:02:37    Page 22 of 41
SMRH:437127496.2

Plan only to the extent that such Claim or Interest is an Allowed Claim in that Class and such Claim or Interest has not been paid, released or otherwise satisfied prior to the Effective Date. Multiple Proofs of Claim filed by a Claim Holder which qualify for inclusion within the same Class shall be aggregated, and if Allowed, shall constitute a single Allowed Claim.

**D.      Classes Under the Plan:**

| Class 1 | Priority Non-Tax Claims | Unimpaired, deemed to accept |
|---|---|---|
| Class 2 | Miscellaneous Secured Claims (each secured creditor in a separate class identified as Class 2A, 2B, etc.) | Unimpaired, deemed to accept |
| Class 3 | Disputed CraneTech Claims | Unimpaired, deemed to accept |
| Class 4 | Local 164B Claim | Impaired, entitled to vote, but have consented to treatment by settlement |
| Class 5 | General Unsecured Claims Against Berkeley Properties | Impaired, entitled to vote |
| Class 6 | General Unsecured Claims Against Second Street Properties | Impaired, entitled to vote |
| Class 7 | Interests in Second Street Properties | Impaired, entitled to vote |
| Class 8 | Interests in Berkeley Properties | Unimpaired, not entitled to vote |

**E.      TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS:**

**Class 1 – Priority Non-Tax Claims.**

**1.      Impairment and Voting.**

Class 1 is unimpaired. Holders of Priority Non-Tax Claims are deemed to have accepted this Plan under Bankruptcy Code section 1126(f) and are not entitled to vote on the Plan.

**2.      Treatment.**

Each Holder of an Allowed Class 1 Claim, unless otherwise mutually agreed upon by the Holder of such Claim and the Debtor, will receive Cash in an amount equal to such Allowed Class 1 Claim on the later of (a) the Initial Distribution Date, or (b) the date such Claim becomes an Allowed Claim pursuant to a Final Order, or as soon thereafter as is practicable, from either the Estate of Second Street Properties or the Estate of Berkeley Properties, as applicable.

Case: 14-41045    Doc# 537    Filed: 04/30/15    Entered: 04/30/15 14:02:37    Page 23 of 41
SMRH:437127496.2                         DISCLOSURE STATEMENT FOR SECOND AMENDED JOINT PLAN

**Class 2 – Miscellaneous Secured Claims.**

**1.** **Impairment and Voting.**

Class 2 is unimpaired under the Plan. Holders of Miscellaneous Secured Claims are deemed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan. For purposes of distributions under the Plan, each holder of a Miscellaneous Secured Claim in Class 2 is considered to be in its own separate subclass within Class 2, and each such subclass is deemed to be a separate Class for purposes of the Plan.

**2.** **Alternative Treatment.**

On the Initial Distribution Date, the Plan Administrator shall select one of the following alternative treatments for each Allowed Miscellaneous Secured Claim in Class 2, which treatment shall be in full and final satisfaction, settlement, release, and discharge of, and exchange for, such Allowed Miscellaneous Secured Claim:

a. *Abandonment or Surrender.*

The Plan Administrator will abandon or surrender to the holder of such Claim the property securing such Claim, in full satisfaction and release of such Claim.

b. *Cash Payment.*

The Plan Administrator will pay to the holder of such Claim Cash equal to the amount of such Claim, or such lesser amount to which the holder of such Claim shall agree, in full satisfaction and release of such Claim, from either the assets of the Estate of Second Street Properties or the assets of the Estate of Berkeley Properties, as applicable.

c. *Unimpairment.*

The Plan Administrator will leave the rights of the holder of such Claim unimpaired or provide for such other treatment as necessary to otherwise satisfy the requirements of the Bankruptcy Code.

**3.** **Unsecured Deficiency Claim.**

Any Unsecured Deficiency Claim asserted by a Holder of an Allowed Miscellaneous Secured Claim in Class 2 shall be filed with the Bankruptcy Court within thirty (30) days following the date of the abandonment or surrender of such Creditor's collateral or such Creditor's

receipt of its distribution under the Plan. Any such Allowed Unsecured Deficiency Claim shall be treated as a Class 5 General Unsecured Claim against Berkeley Properties or a Class 6 General Unsecured Claim against Second Street Properties, as applicable.

**Class 3 – Disputed CraneTech Claims.**

**1.     Impairment and Voting.**

Class 3 is unimpaired under the Plan. The Holder of the Disputed CraneTech Claims is deemed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code and is not entitled to vote on the Plan.

**2.     Initial Treatment of Claim.**

The Class 3 Disputed CraneTech Claims are not Allowed as the validity and priority of their asserted status as secured claims is subject to the CraneTech Adversary Proceeding. Unless and until a Final Order is entered allowing the Disputed CraneTech Claims in any amount, the Plan Administrator shall reserve for the Disputed CraneTech Claims as if they were Class 5 General Unsecured Claims Against Berkeley Properties, as provided in Section VIII.I.2 of the Plan.

**3.     Treatment if Claim is Allowed by a Final Order.**

If the Bankruptcy Court enters a Final Order allowing the Disputed CraneTech Claims as Secured Claims, then the Plan Administrator shall pay to the holder of such Claims Cash equal to the amount of such Claims, or such lesser amount to which the Holder of such Claims shall agree, in full satisfaction and release of such Claims, from either the assets of the Estate of Second Street Properties or the assets of the Estate of Berkeley Properties, as applicable.

If the Bankruptcy Court enters a Final Order allowing the Disputed CraneTech Claims but only as General Unsecured Claims against either or both Estates, then the Disputed CraneTech Claims shall receive the treatment provided in this Article VI of the Plan for an Allowed General Unsecured Claim against the relevant Estate or Estates.

If the Disputed CraneTech Claims are Allowed, either as Secured Claims or General Unsecured Claims, they shall be limited to one recovery from the Debtors' Estates. In other

words, the same Claim asserted against each Estate shall receive a distribution from only one Estate.

**Class 4 – Local 164B Claim.**

  **1.**  <u>**Impairment and Voting.**</u>

  Class 4, which is comprised of the Local 164B Claim, is impaired under the Plan. The Holder of the Local 164B Claim is entitled to vote on the Plan, however the Holder of the Local 164B Claim has consented to its Claim's treatment in this Plan as described below.

  **2.**  <u>**Treatment.**</u>

  The Proponents and Local 164B have reached an agreement on the treatment of the Local 164B Claim, which is as follows. On the Effective Date, the Plan Administrator on behalf of Berkeley Properties shall execute a deed of trust (the "Berkeley Deed of Trust") that encumbers the Berkeley Real Property and secures payment of the contingent Local 164B Claim in the full amount asserted by Local 164B – *i.e.*, $26,702,858. The Berkeley Deed of Trust shall be in the form attached to the Plan Supplement. If (a) New Pacific Steel has not completely or partially withdrawn from Local 164B before July 1, 2020, or (b) New Pacific Steel has completely or partially withdrawn from Local 164B before July 1, 2020, and has completely satisfied all resulting withdrawal liability obligations to Local 164B when and as due, then, no later than 60 days following the occurrence of either (a) or (b) above, Local 164B shall execute and deliver to the Plan Administrator a substitution of trustee and full reconveyance that reconveys the Berkeley Deed of Trust.

  If New Pacific Steel completely or partially withdraws from Local 164B before July 1, 2020, then Local 164B shall promptly deliver written notice of the same to the Plan Administrator accompanied by notice of Local 164B's calculation of the amount of the withdrawal liability of Second Street Properties that may be triggered under ERISA § 4204, 29 U.S.C. §§ 1384 (and such notice shall satisfy any notice requirement to the Plan Administrator under ERISA § 4219(b), 29 U.S.C. § 1399(b)). Thereafter, the Plan Administrator may request review of and contest Local 164B's calculation of the amount of Second Street Properties' withdrawal liability that may be triggered in accordance with ERISA §§ 4219(b) and 4221, 29 U.S.C. §§ 1399(b) and 1401.

Case: 14-41045  Doc# 537  Filed: 04/30/15  Entered: 04/30/15 14:02:37  Page 26 of 41

Except as provided in the preceding sentence and notwithstanding any other provision hereof, neither the Plan Administrator, the Post-Confirmation Committee, nor any other party may, or shall have standing to, file or prosecute any objection to, seek review or reconsideration of, or request estimation of the Local 164B Claim.  If the withdrawal liability is uncontested and/or confirmed through the dispute resolution procedures of ERISA § 4221, 29 U.S.C. § 1401, then the Local 164B Claim shall be an Allowed Claim.

If New Pacific Steel, following a complete or partial withdrawal from Local 164B that occurs prior to July 1, 2020, fails to make any withdrawal liability payment when and as due, and such failure to pay is not cured by New Pacific Steel or the Plan Administrator in the 60-day period following receipt of written notification as provided in ERISA § 4219(c)(5)(A), 29 U.S.C. § 1399(c)(5); and the Plan Administrator subsequently fails to pay said Allowed Local 164B Claim as and when provided by law or the parties' agreement, then Local 164B shall become entitled to exercise any and all remedies available to it under the Berkeley Deed of Trust, including foreclosing on the Berkeley Real Property pursuant to the power of sale in the Berkeley Deed of Trust.

In the event that Local 164B conducts a non-judicial foreclosure on the Berkeley Real Property in order to collect on the Local 164B Claim, Local 164B shall not be entitled to any Claim against either Estate for any deficiency.  Such a deficiency claim shall be deemed fully and finally waived as of the date title to the Berkeley Real Property passes pursuant to such a non-judicial foreclosure sale. The Berkeley Deed of Trust and the foregoing provisions regarding the Berkeley Deed of Trust shall constitute the sole source of recovery against either Estate for the Local 164B Claim.  Local 164B also waives any and all existing or potential future claims for partial or complete withdrawal liability against the Class 7 Interest Holders, to the extent such claims may arise under applicable non-bankruptcy law.  For clarification, the distribution of the Initial Distributable Cash and the Periodic Distributable Cash made to holders of allowed Claims pursuant to the Plan from the payment of rents and other monies received during the term of this Plan shall not trigger withdrawal liability under ERISA because the Berkeley Deed of Trust

Case: 14-41045    Doc# 537    Filed: 04/30/15    Entered: 04/30/15 14:02:37    Page 27 of 41
SMRH:437127496.2
DISCLOSURE STATEMENT FOR SECOND AMENDED JOINT PLAN

satisfies the requirement for the posting of a bond under 29 U.S.C. § 1384(a)(3) and Local 164B consents thereto.

**Class 5 – General Unsecured Claims Against Berkeley Properties.**

**1.     Impairment and Voting.**

Class 5 is impaired under the Plan.  Holders of General Unsecured Claims against Berkeley Properties are entitled to vote on the Plan.

**2.     Treatment.**

On or as soon as practicable following the Effective Date, each Holder of such an Allowed General Unsecured Claim against Berkeley Properties shall receive a Pro Rata share of the Initial Distributable Cash of the Berkeley Properties Estate on the Initial Distribution Date and a Pro Rata share of the Periodic Distributable Cash of the Berkeley Properties Estate on such Periodic Distribution Dates as are established by the Plan Administrator.  As set forth in the definition of Initial Distributable Cash, no part of the Speyside Sale Proceeds constitutes the Initial Distributable Cash of the Berkeley Properties Estate.  To the extent there are sufficient funds with which to pay it, Holders of Allowed General Unsecured Claims against Berkeley Properties are entitled to interest at the Legal Rate.

**Class 6 – General Unsecured Claims Against Second Street Properties.**

**1.     Impairment and Voting.**

Class 6 is impaired under the Plan.  Holders of General Unsecured Claims against Second Street Properties are entitled to vote on the Plan.

**2.     Treatment.**

On or as soon as practicable following the Effective Date, each Holder of such an Allowed General Unsecured Claim against Second Street Properties shall receive a Pro Rata share of the Initial Distributable Cash of the Second Street Properties Estate on the Initial Distribution Date and a Pro Rata share of the Periodic Distributable Cash of the Second Street Properties Estate on such Periodic Distribution Dates as are established by the Plan Administrator.  To the extent there are sufficient funds with which to pay it, Holders of Allowed General Unsecured Claims against Second Street Properties are entitled to interest at the Legal Rate.

**Class 7 – Interests in Second Street Properties**

    **1.**    **Impairment and Voting.**

    Class 7 is impaired under the Plan. Holders of Interests in this Class are entitled to vote on the Plan.

    **2.**    **Treatment.**

    Holders of Class 7 Interests in Second Street Properties shall receive common stock in Reorganized Second Street Properties in an amount equal to the common stock held by such Interest Holders on the Petition Date, as follows:

| Interest Holder | Security Class | Number of Shares and % of Issued and Outstanding Shares |
|---|---|---|
| CAMLEE CORPORATION<br>89 Alvarado Road<br>Berkeley, CA 94705 | Common | 27,000 shares, or 6.522% |
| DAVI ASSOCIATES<br>129 Sunnyglen Drive<br>Vallejo, CA 94591 | Common | 29,000 shares, or 7.004% |
| EMMERICHS ASSOCIATES<br>1674 Glazier Drive<br>Concord, CA 94521 | Common | 9,000 shares, or 2.174% |
| TRI-PACIFIC, INC.<br>85 Lakeside Drive<br>Corte Madera, CA 94925-1037 | Common | 340,000 shares or 82.126% |
| WESTRIDGE CAPITAL<br>89 Alvarado Road<br>Berkeley, CA 94705 | Common | 9,000 shares or 2.174% |

    Such newly issued common stock shall be represented by stock certificates issued by the Plan Administrator on behalf of Reorganized Second Street Properties on the Effective Date. Stock certificates representing the pre-petition Interests held by such Holders on the Petition Date shall be deemed cancelled as of the Effective Date of the Plan.

    Holders of Class Interests shall also receive a Pro Rata share of the Periodic Distributable Cash, if any, remaining after payment of Class 5 General Unsecured Claims against Berkeley Properties and Class 6 General Unsecured Claims Against Second Street Properties in full with interest at the Legal Rate. Such distributions, if any, shall be made by the Plan Administrator on such Periodic Distribution Dates as are established by the Plan Administrator. Among other

things, such distributions to Holders of Class 7 Interests may include distributions from the proceeds of a sale of the Berkeley Real Property after such proceeds are used to satisfy all Class 5 General Unsecured Claims against Berkeley Properties and Class 6 General Unsecured Claims Against Second Street Properties in full with interest at the Legal Rate. The Plan Administrator shall also give advance written notice to Holders of Allowed Class 7 Interests prior to listing the Berkeley Real Property for sale.

Holders of Class 7 Interests shall be deemed to grant to the Post-Confirmation an irrevocable proxy to exercise all voting and approval rights represented by the Interests under the Debtors' organizational documents until such time as all Holders of Allowed Claims in Classes 5 and 6 are repaid in full with interest at the Legal Rate. Upon such repayment, the proxy shall be automatically revoked.

**Class 8 – Interests in Berkeley Properties**

1. **Impairment and Voting.**

Class 8 is unimpaired under the Plan. Holders of Interests in this Class are deemed to accept the Plan.

2. **Treatment.**

Holders of Class 8 Interests in Berkeley Properties shall retain their Interests in Reorganized Berkeley Properties, which will be governed by an Amended and Restated Operating Agreement to be attached to the Plan Supplement. As described in Article III of this Plan, the sole Holder of Interests in Berkeley Properties is Second Street Properties. Thus, after the proceeds produced by the assets of Berkeley Properties are used to pay Holders of Allowed Class 5 Claims against Berkeley Properties, said proceeds will be used to make distributions to Holders of Allowed Class 6 Claims against Second Street Properties and Class 7 Interests in Second Street Properties in the manner described above.

**F. PRELIMINARY ESTIMATES OF ALLOWED CLAIMS**

The Debtors and the Committee have done a very preliminary analysis of the claims filed in the Bankruptcy Cases in order to develop projections of the range of estimated allowed claims in each class for the purposes of this Disclosure Statement. Those estimates are set forth on the

Case: 14-41045   Doc# 537   Filed: 04/30/15   Entered: 04/30/15 14:02:37   Page 30 of
41

chart below, and include estimates for both unclassified claims and classified claims. Parties in interest must bear in mind when reviewing these estimates though that they <u>very preliminary</u>. The asserted claims against the estates greatly exceed those set forth in the chart below, and therefore the chart represents a rough estimate of how claim objections commenced by the Plan Administrator following the confirmation of this Plan will be resolved. Without the benefit of the further analysis and discovery that would be involved in those many claim objections, the estimates below are very preliminary and non-binding. The actual allowed claims in each class may vary significantly from the estimates or ranges set forth below. The estimates represent simply the best effort of the Debtors and the Committee to provide information to interested parties at this stage of the Bankruptcy Cases. By providing these estimates, the Debtors and the Committee are in no way binding themselves or the Plan Administrator to the estimates or limiting their ability or the Plan Administrator's ability to object to any claims at a later point in time. With those caveats and limitations, the Debtors and the Committee currently estimate the Allowed unclassified and Classified claims to be as follows:

| Class No. | Description | Estimated Allowed Amount |
|---|---|---|
| N/A | Allowed Administrative Expense Claims | TBD[2] |
| N/A | Allowed Priority Tax Claims | $60,000[3] |
| 1 | Priority Non-Tax Claims | $124,650 |
| 2 | Miscellaneous Secured | $0 |

[2] The Allowed Administrative Expense Claims are comprised of Professional Fees, U.S. Trustee Fees, Administrative Expense Claims under Section 503(b)(9) of the Bankruptcy Code, and other Administrative Expenses. The Plan Proponents currently estimate that the Allowed 503(b)(9) Claims will be ultimately be roughly $375,000 if all anticipated objections are sustained, with a maximum exposure of roughly $500,000. The other large piece of this analysis consists of Professional Fee Claims. The Estate Professionals indicated at the hearing on approval of the Disclosure Statement that they estimated Professional Fee Claims incurred and unpaid for the second interim period through March 31, 2015 to be approximately $630,000. This is an estimate only, and is subject to change when applications are filed by the Estate Professionals.

[3] The Internal Revenue Service has filed a "protective claim" in excess of $32 million based on a random audit that would, if Allowed, constitute a Priority Tax Claim. The audit is expected to be complete by July 31, 2015. As explained elsewhere in this Disclosure Statement, given the significant losses suffered by Second Street Properties during the period of time in question, the Plan Proponents do not believe the audit will result in any Allowed Claim against the Estate of Second Street Properties.

SMRH:437127496.2                          DISCLOSURE STATEMENT FOR SECOND AMENDED JOINT PLAN

| | | |
|---|---|---|
| | Claims | |
| 3 | Disputed Crane Tech Claim | $0 |
| 4 | Local 164B Claim | Contingent Liability Up to $26,702,858, Secured by Berkeley Deed of Trust Which is the Sole Source of Recovery for this Claim |
| 5 | General Unsecured Claims Against Berkeley Properties | $183,000 |
| 6 | General Unsecured Claims Against Second Street Properties | $15,000,000 |

**ARTICLE VI**

**ALTERNATIVES TO THE PLAN**

A.      **General:**

The Debtors and Committee believe that the Plan provides their creditors with the greatest value that is likely to be obtained on their respective claims.  The primary alternative to Confirmation of the Plan is liquidation of the estates under Chapter 7 of the Bankruptcy Code.

B.      **Best-Interests–of-Creditors Test and Chapter 7 Liquidation Analysis:**

The Bankruptcy Code requires as a condition to confirmation of any plan of reorganization that a plan provide that creditors will, as of the effective date of a plan on account of their claims, receive not less than the amount that the holder would receive if the

Debtors were liquidated in Chapter 7 on the same date.

There are three significant financial differences between the proposed chapter 11 Plan and liquidation in Chapter 7.  First, under the terms of the approved settlement of the Rodriguez Class Action Settlement, if Second Street Properties case were to convert to chapter 7, then the amount of the Allowed unsecured claim held on behalf of the class of claimants in the Rodriguez Class Action would increase from $5.4 million to $25 million.  This would adversely affect the pro-rata distribution received by all other creditors holding Class 6 Allowed unsecured Claims.

Second, conversion of either the Second Street Properties or Berkeley Properties bankruptcy cases to Chapter 7 would create in a "triggering event" under ERISA  the result of

Case: 14-41045    Doc# 537    Filed: 04/30/15    Entered: 04/30/15 14:02:37    Page 32 of 41

which would mean that the Debtors would be liable for contingent withdrawal liability to the Pension Trust as part of a multi-employer pension plan of which Second Street Properties has participated. The Pension Trust has filed a proof of claim in the amount of $26,702,858 for such contingent withdrawal liability. If either bankruptcy case were to convert to chapter 7, that contingent claim would become a fixed and Allowed Claim, which together with the claim of the Rodriguez Class Action claimants would swamp the Class 6 unsecured creditor class and would adversely affect the pro-rata distribution received by all other Class 6 unsecured creditors holding Allowed Claims.

Last, in a Chapter 7 liquidation, a chapter 7 panel trustee is appointed. A Chapter 7 trustee is compensated based upon a commission set by statute. 11 U.S.C. §326(a) provides that a chapter 7 trustee's compensation is 25% of the first $5,000 disbursed or turned over to parties in interest, 10% of the next $45,000, 5% of the next $950,000, and reasonable compensation not to exceed 3% of any amounts in excess of $1 million. Such fees would constitute an additional expense born by the Debtors' estates in a chapter 7 case. On top of the chapter 7 trustee's commission, the Chapter 7 trustee would likely hire his own counsel, unfamiliar with the cases, whose fees and costs would add yet another layer of administrative expenses that would need to be paid before general unsecured creditors. The chapter 7 trustee's professionals would each need to learn about claims and avoidance actions that the Debtors' counsel has prepared to assert, as well as filing income tax returns. In a chapter 7, there would also be costs associated with noticing new claims bar dates which is significant in these cases due to there being over 1700 creditors. The reopened bar date would further increase the burden of reviewing and objecting to new claims or different claims filed after such a new bar date.

In addition to the above economics, there would be no interim distributions in a Chapter 7 case and a final distribution would likely not occur for several years after conversion. As a result, the best-interests-of-creditors test has been met.

Case: 14-41045    Doc# 537    Filed: 04/30/15    Entered: 04/30/15 14:02:37    Page 33 of
41

**ARTICLE VII**

**FEASIBILITY**

The Bankruptcy Code requires a finding that confirmation of the Plan is not likely to be followed by either liquidation or the need for further reorganization. The Proponents' ability to confirm a Plan in this case depends upon the availability of funds on hand and the future payment of cash through the rents received by Berkeley Properties from the Buyer and/or the sale of the Real Property. With the available cash on hand, the Debtors have sufficient funds to make all payments that will be due on the Effective Date.

The Debtors are obligated to pay, as expenses of administration, any taxes that became due and owing after the Petition Date. Prior to the closing of the asset sale, Second Street Properties utilized a payroll service and therefore all post-petition payroll related taxes have been paid in full at this time. Second Street Properties has also filed a final 2014 return with the California State Board of Equalization for Sales and Use Taxes and has paid all taxes due thereunder. The Debtors have consulted with their appointed CPAs regarding projected income taxes for the tax year April 1, 2014 through March 31, 2015 and have been advised that there will be zero income tax liability due as a result of (a) accumulated operating losses, (b) the sale of assets at a loss and (c) operating loss for the current tax year. Hence, the Plan is feasible.

Second Street Properties currently hold more than $2 million that is available for distribution to creditors following confirmation. Approximately $620,000 of this amount will be needed on the Effective Date to pay unclassified claims, including pre-petition priority wage claims under 11 U.S.C. §507(a)(7) and administrative claims under 11 U.S.C. §503(b)(9) for the value of goods delivered to Second Street Properties during the 20 day period immediately preceding the Petition Date. Following confirmation, Second Street Properties will also be required to pay for pre-confirmation professional fees subject to approval of the Court following one or more hearings on duly noticed applications for compensation by the professionals appointed in these cases.

There are several factors that will ultimately affect the amount and timing of distributions to general unsecured creditors. These factors include: (1) the outcome of the pending objection to

30

DISCLOSURE STATEMENT FOR SECOND AMENDED JOINT PLAN

the $32 million priority tax claim of the Internal Revenue Service, (2) the ongoing performance of the Buyer under the (i) real property lease agreement and (ii) multi-employer union pension plan, and (3) the amount of proceeds received when the real property currently owned by Berkeley Properties is eventually sold.

If the claim of the IRS is valued at zero or some other nominal amount for purposes of confirmation the Plan, then an interim distribution to Class 6 Allowed Claims shortly after the Effective Date will be possible.

If the Buyer makes rental payments according to the terms of the real property lease, then following the second year after the Effective Date of the Plan, additional interim distributions to Class 6 Allowed Claimants would also be possible. Eventually when the Berkeley real property is sold following the fifth year after the Effective Date, the sale proceeds are expected to be more than sufficient to repay the balance owed to Class 6 and 7 Allowed Claims in full with interest. This also presumes that the real property, which value was estimated at $13,225,000 on the Petition Date, will not substantially decline in value before it is sold. The Debtors expect based on the advice of their CPA's that their operating losses for pre-petition years as well losses as for the post-petition period and losses on the sale of assets, will be upheld and provide the ability to offset potential tax gains realized on the future sale of the real property under Internal Revenue Code Section 1231 because the real property was used in the operation of a business.

## ARTICLE VIII
## CONFIRMATION

A.    **Voting:**

In order to confirm the Plan, two-thirds in amount and a majority in number of Allowed Claims in each impaired class of creditors must vote in favor of the Plan. The majorities for each are determined by the number and amount of those who actually vote on the Plan and are entitled to vote on the Plan under Bankruptcy Rule 3018.

If a class which is impaired under the Plan does not vote in favor of the Plan, the Debtors may seek confirmation under 11 U.S.C. § 1129(b).

Case: 14-41045    Doc# 537    Filed: 04/30/15    Entered: 04/30/15 14:02:37    Page 35 of 41
SMRH:437127496.2

**B.** **Confirmation Standards:**

For the Plan to be confirmed and binding on all creditors and shareholders, the Court must determine that the following requirements under 11 U.S.C. §§ 1129(a)(1) through (16), as applicable in these cases, have been satisfied:

1. The Plan complies with the provisions of the Code;

2. The Proponents have complied with the provisions of the Code;

3. The Plan has been proposed in good faith and not by any means forbidden by law;

4. Any payment made or to be made by the Debtors for services or costs in connection with the Bankruptcy Case has been or will be subject to approval by the Court as reasonable;

5. The Proponents have disclosed the identity and affiliations of any individual to serve after Confirmation as an officer or director of the Debtors, an affiliate of the Debtors participating in a joint plan, or a successor to the Debtors under the Plan, and the identity of and compensation payable to any insider that will be employed by the reorganized debtor;

6. Any rate change provided for in the Plan has been approved or is subject to approval by the regulatory commission with jurisdiction over such rates, if any;

7. The holder of each claim or interest in each class of impaired claims or interests has accepted the Plan or will receive under the Plan not less than the holder would receive if the Debtors' estates were liquidated under Chapter 7 of the Code;

8. Each class of claims or interests has accepted or is not impaired by the Plan;

9. Holders of allowed administrative or priority claims under the Code will receive Cash in the full amount of their claims on the Effective Date, unless the holder thereof agrees to a different treatment;

10. At least one impaired class of claims has accepted the Plan;

11. Confirmation is not likely to be followed by liquidation or further reorganization of the debtor unless such liquidation or reorganization is proposed in the Plan;

12. All fees payable to the U.S. Trustee under 11 U.S.C. §1930 have been paid or the Plan provides for the payment of such fees;

Case: 14-41045    Doc# 537    Filed: 04/30/15    Entered: 04/30/15 14:02:37    Page 36 of 41

1     13.     The Plan provides after its Effective Date for the continuation of all retiree benefits,

2  as and when required by 11 U.S.C. §1129(a)(13);

3     14.     All transfers of property under the Plan shall be made in accordance with any

4  applicable provisions of nonbankruptcy law; and

5     15.     The principal purpose of the Plan is not avoidance of taxes or the avoidance of the

6  security laws of the United States.

7  **C.**    **Modification:**

8     Under the Code and the Bankruptcy Rules, the Proponents may, subject to the Code and

9  Bankruptcy Rules and Bankruptcy Court approval, modify the Plan after the Plan has been

10  submitted for acceptance or rejection.  In addition, the Plan may be modified after Confirmation

11  and at any time until the Plan has been substantially consummated by the Debtors or any creditor.

12  The manner in which the Plan may be modified is set forth in 11 U.S.C. § 1127 and Bankruptcy

13  Rule 3019.  In general, the Court may approve a modification of the Plan without a re-solicitation,

14  so long as (a) the Plan, as modified, continues to comply with the applicable provisions of the

15  Bankruptcy Code, and (b) modification does not adversely change the treatment of creditors.

16  **ARTICLE IX**

17  **FEDERAL INCOME TAX CONSEQUENCES OF PLAN FOR CREDITORS**

18     Implementation of the Plan may result in federal income tax consequences to creditors.

19  Tax consequences to a particular creditor may depend on the particular circumstances or facts

20  regarding the claim of the creditor.  No tax opinion has been sought or will be obtained with

21  respect to any tax consequences of the Plan, and the following disclosure does not constitute and is

22  not intended to constitute either a tax opinion or tax advice to any person.  Rather, the following

23  disclosure is provided for informational purposes only.

24     The federal tax consequences of the Plan to a hypothetical creditor typical of the holders of

25  claims or interests in this case depend to a large degree on the accounting method adopted by that

26  hypothetical creditor.  A "hypothetical creditor" in this case is defined as a general unsecured

27  creditor. In accordance with federal tax law, a holder of such a claim that uses the accrual method

28  and who has posted its original sale to one of the Debtors as income at the time of the product sold

Case: 14-41045    Doc# 537    Filed: 04/30/15    Entered: 04/30/15 14:02:37    Page 37 of 41

or the service provided hypothetically should adjust any net operating loss to reflect the amounts paid by the Debtors under the Plan provided that holder previously deducted the liability owed by Second Street Properties as a "bad debt" for federal income tax purposes. Should that holder lack a net operating loss, then in accordance with federal income tax provisions, the holder should treat the dividend paid as ordinary income, again provided the holder previously deducted the liability of Second Street Properties as a "bad debt" for federal income tax purposes. If the accrual basis holder of the claim did not deduct the liability as a "bad debt" for federal income tax purposes, then the amount paid by the Debtors has no current income tax implication. A holder of a claim that uses a cash method of accounting would, in accordance with federal income tax laws, treat the amount paid as income at the time of receipt.

THE PROPONENTS MAKE NO REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO ANY CREDITOR. EACH PARTY AFFECTED BY THE PLAN SHOULD CONSULT HER, HIS OR ITS OWN TAX ADVISORS REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO A CLAIM.

## ARTICLE X

## CONCLUSION

**A.      Effect of Confirmation:**

If the Plan is confirmed, its terms and conditions will be binding on all creditors and shareholders.

**B.      Recommendation:**

This Disclosure Statement has been presented for the purpose of enabling you to make an informed judgment to accept or reject the Plan. You are urged to read the Plan in full and consult with counsel if you have questions. The Debtors and the Committee believe that acceptance of the Plan is in the best interest of all creditors, and will provide the best recovery in these Bankruptcy Cases.

*[Signature Page Following]*

Case: 14-41045    Doc# 537    Filed: 04/30/15    Entered: 04/30/15 14:02:37    Page 38 of 41

| | |
|---|---|
| 1 | Dated: April 29, 2015 |
| 2 | |
| 3 | |
| 4 | |
| 5 | Dated: April 29, 2015 |
| 6 | |
| 7 | |
| 8 | Dated: April __, 2015 |
| 9 | |
| 10 | |
| 11 | |
| 12 | Dated: April __, 2015 |
| 13 | |
| 14 | |
| 15 | Dated: April __, 2015 |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

Dated: April 29, 2015     SECOND STREET PROPERTIES

*Catherine Delsol*

By:   /s/ Catherine Delsol
      Catherine Delsol
      President and Responsible Individual

Dated: April 29, 2015     BERKELEY PROPERTIES LLC

*Catherine Delsol*

By:   /s/ Catherine Delsol
      Catherine Delsol
      Managing Member and Responsible Individual

Dated: April __, 2015     BINDER & MALTER, LLP

By:   /s/ Julie H. Rome-Banks
      Julie H. Rome-Banks
      Attorneys for Debtors-in-Possession
      Second Street Properties and Berkeley Properties LLC

Dated: April __, 2015     OFFICIAL COMMITTEE OF UNSECURED CREDITORS'

By:   /s/ Dawn White
      Dawn White, its Chair

Dated: April __, 2015     SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP

By:   /s/ Michael Lauter
      Michael Lauter
      Attorneys for Official Committee of Unsecured Creditors

SMRH:437127496.2

DISCLOSURE STATEMENT FOR SECOND AMENDED JOINT PLAN

| | |
|---|---|
| 1 | Dated: April ___, 2015 |
| 2 | |
| 3 | |
| 4 | |
| 5 | Dated: April ___, 2015 |
| 6 | |
| 7 | |
| 8 | Dated: April ___, 2015 |

Dated: April ___, 2015      SECOND STREET PROPERTIES

By:      /s/ Catherine Delsol
         Catherine Delsol
         President and Responsible Individual

Dated: April ___, 2015      BERKELEY PROPERTIES LLC

By:      /s/ Catherine Delsol
         Catherine Delsol
         Managing Member and Responsible Individual

Dated: April ___, 2015      BINDER & MALTER, LLP

By:      /s/ Julie H. Rome-Banks
         Julie H. Rome-Banks
         Attorneys for Debtors-in-Possession
         Second Street Properties and Berkeley Properties LLC

Dated: April 28, 2015      OFFICIAL COMMITTEE OF UNSECURED CREDITORS'

By:      /s/ Dawn White
         Dawn White, its Chair

Dated: April ___, 2015      SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP

By:      /s/ Michael Lauter
         Michael Lauter
         Attorneys for Official Committee of Unsecured Creditors

-35-

SMRH:437127496.2          DISCLOSURE STATEMENT FOR SECOND AMENDED JOINT PLAN

1 | Dated: April 30, 2015              SECOND STREET PROPERTIES

2
                                       By:     /s/ Catherine Delsol
3                                              Catherine Delsol
                                               President and Responsible Individual
4
  | Dated: April 30, 2015              BERKELEY PROPERTIES LLC
5
6                                      By:     /s/ Catherine Delsol
                                               Catherine Delsol
7                                              Managing Member and Responsible Individual

8 | Dated: April 30, 2015              BINDER & MALTER, LLP

9
                                       By:     /s/ Julie H. Rome-Banks
10                                             Julie H. Rome-Banks
                                               Attorneys for Debtors-in-Possession
11                                             Second Street Properties and Berkeley Properties LLC

12 | Dated: April 30, 2015             OFFICIAL COMMITTEE OF UNSECURED CREDITORS'

13
                                       By:     /s/ Dawn White
14                                             Dawn White, its Chair

15 | Dated: April 30, 2015             SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP

16
                                       By:     /s/ Michael Lauter
17                                             Michael Lauter
                                               Attorneys for Official Committee of Unsecured Creditors
18

19

20

21

22

23

24

25

26

27

28

-35-

Case: 14-41045   Doc# 537   Filed: 04/30/15   Entered: 04/30/15 14:02:37   Page 41 of
41

SMRH:437127496.2                                DISCLOSURE STATEMENT FOR SECOND AMENDED JOINT PLAN